### CALLAWAY v. ORIENT INS. CO.

(District Court, N. D. Ohio, W. D. July 18, 1894.)

### No. 171.

1. MARINE INSURANCE—OPEN POLICY.
   A literal compliance with a clause in an open policy that "no shipment is to be considered as insured until approved and indorsed hereon by this company" will not be required where it appears that it was a physical impossibility to make such indorsements, no space being left therefor, and, under the settled method of doing such business, blank books were furnished by the company in which the insurer entered the shipment, etc., which were examined and adjusted each month by the local agents.

2. SAME.
   A provision in an open policy, "Shipments to be reported to the agents of said company at T.," will not be construed to mean all shipments, where it was well known to the insurer's agents that the insured did not make it a practice to insure all shipments, and previous policies contained an express agreement to report all shipments.

This was a libel in admiralty.

Brown & Geddes and Clarence Brown, for libelant.

Butler, Stillman & Hubbard and Wilhelmus Mynderse, for respondent.

RICKS, District Judge. This is a proceeding in admiralty, instituted by Samuel R. Callaway, receiver of the Toledo, St. Louis & Kansas City Railroad Company, for himself and on behalf of all others whom it may concern, against the Orient Insurance Company, a corporation organized and existing under the laws of

the state of Connecticut. The bill, after averring the appointing of the receiver, and the making of an order by the circuit court for this district, empowering him to operate said road, and to operate a line of steamboats between Toledo, Ohio, and Buffalo, N. Y., known as the Toledo, St. Louis & Kansas City Railroad Company Steamboat Line, proceeds to aver that on or about the 1st day of April, 1893, the respondent, the Orient Insurance Company, duly executed and delivered to the said Toledo, St. Louis & Kansas City Railroad Company its policy of insurance, in writing, a copy of which is attached to the libel, and marked "Exhibit A," whereby, in consideration of the premium agreed to be paid, it covenanted and agreed to insure the said Toledo, St. Louis & Kansas City Railroad Company, doing business under the name of the Toledo, St. Louis & Kansas City Railroad Company Steamboat Line, for account of whom it might concern, against all loss and damage by reason of the perils of the lakes, etc. The libelant seeks to recover upon this policy of insurance for package freight, freight lists, and freight charges of goods shipped on the steamer Dean Richmond on the 13th of October, 1893, from the port of Toledo to the port of Buffalo, the invoice value of which, with 10 per cent. added for package freight, was $42,781.61; for freight list, $2,256.60; and for freight charges, $317.51. The issuance of the policy is admitted as averred in the libel. The proof shows that the application for this policy was filed, by the authority of the general freight agent of the receiver, with Barker & Frost, the local agents of the insurance company at Toledo. It appears from the proof that this firm are agents for several companies, both for fire and marine insurance; that, when the application for this insurance was filed with them, they forwarded the same to Smith, Davis & Co., who are the general agents of the Orient Insurance Company, and several other companies at Buffalo, N. Y. The said firm of general agents placed the risk in this case with the respondents, and sent back a policy duly executed and signed.

The proof shows that the railroad company, of which Mr. Callaway is receiver, had taken out, for the years 1890 and 1891, similar policies in the same company, through the same agencies, to cover package freight by the line of steamers operated by the railroad between Toledo and Buffalo. The policy is what is known as an "open policy," and insures package freight, freight lists, and freight charges belonging to the said steamboat line at risk and reported as herein stipulated. The provision as to reports reads as follows: "Shipments to be reported to the agents of said company at Toledo, Ohio." Another clause in the policy provides: "No shipment to be considered as insured until approved and indorsed hereon by this company." As the construction claimed for this policy by the respondent renders it void, because the agents of the receiver did not report all shipments for insurance to be accepted and indorsed, it becomes important to ascertain from the proof how the business was conducted between the insurer and the insured, for the clause quoted evidently was intended to give some authority to the agent to whom the shipments are to

be reported. The policy does not say all shipments shall be reported. It does not say how they shall be reported. In this respect the policy is quite different from that issued by the same insurance company to the Toledo, St. Louis & Kansas City Railroad Company in 1892. The provision in that policy read: "The assured agrees to report all shipments to this company, and a failure to report the full value of each and every shipment shall render this insurance null and void." This policy was allowed to be offered in evidence for the purpose of showing the previous agreement and understanding between the insured and the insurer, and especially to show the change in the practice of reporting shipments as directed by the agents of the insurance company. This policy of 1892 was issued by the same general agents, Smith, Davis & Co., at Buffalo, N. Y., who issued to the same railroad company the policy of 1893 and the policies of 1890 and 1891. The omission in the policy of 1893 of the clause just above quoted, when taken in connection with the instructions and practice established by the agents of the insurance company with reference to reports made of shipments, is very significant, and throws a great deal of light upon the true nature of this insurance contract. The clause in the policy of 1893 upon which this action is based, which provides, "No shipment to be considered as insured until approved and indorsed hereon by this company," could not have been intended to be literally complied with, for it was a physical impossibility, in fact, to have made such indorsements upon the policy. No space was provided for such indorsements. No blanks were provided for such indorsements. The mode of reporting was otherwise provided through the general agents of the insurer. Blank books were furnished to the general agents, and by them furnished to the local agents of the insurance company, who, in turn, furnished the same to the agents of the insured; and in these books were certain printed directions, which, with the oral instructions given by the agents of the insurance company, and a custom which was prescribed and carried out by these agents, made and established a certain fixed method for doing this business, which must have been well known to the general agents of the insurance company and to the company itself. The printed indorsement on these blank books so furnished by the insurance company read as follows: "This book is made part of Orient policy No. 156, and all risks entered herein are subject to all its terms and conditions." The instructions contained in the books and directions given by the respondent's agents were that the agents of the receiver at Toledo and Buffalo were to enter in the forms prescribed in the books such package freight as the insured desired to be covered by the risk. These entries were made as each boat was loaded. The values were placed in the proper column, and the amount of premium to be paid was entered in its proper place. At the end of each month, these books, with their entries, were examined by the local agents, and compared, and the premiums then paid. The local agents of the respondent had the right, under the policy, to examine all the

books and bills of lading, and all papers of the insured by which to test the correctness of the entries made in the books. The latter were a part of the policy. As no space was left on the policy for the indorsements required, the books supplied the want. They were therefore a part of the contract, and the manner of their use was to be prescribed by the local agents of the insurance company. It appears from the testimony that these books were furnished to the agent of the receiver at Buffalo by Smith, Davis & Co., the general agents of the company, conspicuously advertised in the company's policy as its "General Agents." The mode of making the entries in the books was known to them. As these methods were not in violation of any provision of the insurance policy, and did not vary or contradict the terms thereof, it was entirely proper that the instructions of the general and local agents of the company should be shown by testimony, and the custom for doing this part of the business prescribed by them was clearly within the scope of their authority. The practice for three seasons, followed by the agents of both parties, was in perfect accord with the forms, blanks, and books furnished by the company. We may justly conclude the practice was prescribed by the company, and known to and ratified by it.

I am clearly of the opinion that the company has no pretext whatever for refusing to recognize the act of its agents and the mode in which they carried on business with the receiver. It must have been known that the same mode of carrying on business had been recognized in the two preceding seasons of 1890 and 1891, when its same general agents, executed the same kind of a policy. I do not find in the proof, or in any provision of the policy of insurance, any basis for the claim that, because some freight was shipped in cargoes where most of the package freight was reported and insured, such failure to insure all shipments avoided the policy. The receiver's agents made no secrecy of the fact that they did not insure freight which the consignors themselves had insured. That would have been double insurance. The practice was well known to the agents of the insurance company, for they insured such freight in their own offices for the benefit of other insurance companies. It seems plain to me, therefore, that this policy provided for future insurance, and that each indorsement of shipment made in the books provided and furnished by the insurance company for that purpose was a contract of insurance under the policy. This was what the practice and custom prescribed by the books furnished by the company itself, and by the instructions of its agents, clearly contemplated. They also understood it, and I think the contract was binding, and was supported by the consideration provided by the policy. The libelant may therefore have a decree for the amount of shipments indorsed in the books for the cargo of the Dean Richmond for October 13, 1893. The loss of this cargo was proven, and the fact not controverted by the company. If counsel can agree on the amount, it may be so entered; otherwise there may be a reference to a master in the usual way.